T.C. Memo. 2012-81

UNITED STATES TAX COURT

ESTATE OF DAVID A. KAHANIC, DECEASED,
EDWARD M. FIALA, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23800-09.                    Filed March 21, 2012.

<u>David Gerhard Strom</u>, <u>Sharon M. Buccino</u>, and <u>John J. Morrison</u>, for petitioner.

<u>H. Barton Thomas, Jr.</u>, and <u>Angela B. Friedman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined a $1,188,974 deficiency in the Federal estate tax of the Estate of David A. Kahanic (estate).  The issues for decision are:  (1) whether David A. Kahanic (decedent) possessed at his death incidents of ownership in a $2,495,000 life insurance policy, thereby making the policy proceeds includible in the value of decedent's gross estate under section 2042(2);[1] (2) if so, whether an agreed order entered by the Circuit Court of Cook County, in effect when decedent died, created an indebtedness in respect of the policy proceeds that entitles the estate to a deduction of $1,995,000 under section 2053(a)(4);[2] (3) whether the estate is entitled to deduct, under section 2053(a)(2), accrued interest on a loan made by decedent's ex-wife to the estate to allow the estate to pay its Federal and Illinois estate taxes; and (4) whether the estate is entitled to deduct, under section 2053(a)(2), attorney's and accountant's fees

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  Respondent concedes that the estate is entitled to deduct $500,000 of the policy proceeds under sec. 2053.  Thus, the parties disagree over whether the estate may deduct the remaining $1,995,000.

incurred after the estate filed its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. Decedent died on August 11, 2005, and as of that date he resided in Schaumburg, Illinois.[3] On August 23, 2005, and pursuant to decedent's will, Edward M. Fiala was appointed executor of the estate.[4] Mr. Fiala is the former brother-in-law of decedent and the brother of Ms. Kahanic, decedent's ex-wife. Decedent and Ms. Kahanic married on October 22, 1988, and divorced in 2004. They had two children during their marriage. Decedent, a medical doctor, was the sole owner of Aesthetic Eye Plastic Surgery (AEPS). Ms. Kahanic worked as the office manager at AEPS for approximately 10 years, ending around 2000 or 2001.

---

[3] Schaumburg, Illinois, is in Cook County.

[4] Decedent's will named Susan Kahanic, his wife at the time he executed his will, as executor of the estate and Mr. Fiala as successor executor. Under Illinois law, a dissolution of marriage of the testator revokes every legacy, interest, or power of appointment given to the testator's former spouse in a will executed before the entry of the judgment for dissolution of marriage. 755 Ill. Comp. Stat. Ann. 5/4-7(b) (West 2007). Decedent executed his will on August 30, 1996, and he and Ms. Kahanic divorced in 2004. Thus, Ms. Kahanic could not be executor of the estate, and Mr. Fiala was appointed executor upon probate of decedent's will.

Decedent's Health Problems

Decedent was significantly overweight and suffered from high blood pressure. In 2000 he became severely ill and had to be admitted to the hospital, where he was diagnosed with an enlarged heart. Decedent was unable to return to work until the end of 2001.

Decedent's Life Insurance Policies

Decedent obtained the following life insurance policies before being diagnosed with an enlarged heart: (1) Security-Connecticut policy No. XXX491R with a death benefit of $495,000; (2) Security-Connecticut policy No. XXX013W with a death benefit of $2 million; (3) American General policy No. XXXXXX112L with a death benefit of $3 million (AIG policy); and (4) Prudential term life policy No. XXXX9322 with a death benefit of $2 million that he converted to Prudential universal life policy No. XXXX6899 on February 20, 2004 (Prudential policy). Following a merger of Security-Connecticut Life Insurance Co. and Reliastar Insurance Co., the Security-Connecticut policies were reissued to decedent by Reliastar as policy No. XXXX15856B with a death benefit of $2,495,000 (Reliastarpolicy or policy).[5] At all relevant times the Reliastar and Prudential

_____

[5] Although the merger between Security-Connecticut and Reliastar had not been completed at the time of some of the events discussed infra, for simplicity we

(continued...)

policies named Ms. Kahanic the sole beneficiary. The policies were in effect when decedent died.

Divorce Proceedings and Marital Settlement Agreement

On February 13, 2002, Ms. Kahanic filed a petition for dissolution of marriage in the Circuit Court of Cook County, Illinois (circuit court). Around that time she learned that decedent had missed a deadline to pay a premium on one of his life insurance policies. This concerned Ms. Kahanic, who believed that decedent's poor health would make it difficult for him to acquire life insurance if his policies lapsed.

On May 27, 2004, the circuit court entered a judgment for dissolution of decedent and Ms. Kahanic's marriage (judgment for dissolution). That same day the parties entered into a marital settlement agreement (MSA) that was incorporated verbatim into the judgment for dissolution. The MSA stated, inter alia, decedent's child support and spousal maintenance obligations, required decedent to secure his unpaid child support and spousal maintenance payments with life insurance proceeds, and included provisions on how decedent would

---

[5](...continued)
will refer to the two Security-Connecticut life insurance policies as the Reliastar policy throughout the opinion.

provide proof to Ms. Kahanic that he had secured his unpaid obligations with life insurance and timely paid the premiums.

With respect to child support, decedent was obligated under the MSA to pay Ms. Kahanic $7,000 per month and to secure his unpaid future payments with a life insurance policy with a minimum death benefit of $1,200,000.[6] As for spousal maintenance, the parties agreed that Ms. Kahanic was to receive $672,000 to be paid in 96 monthly payments of $7,000. Decedent was required to secure payment of his unpaid spousal maintenance by naming Ms. Kahanic an irrevocable beneficiary to $500,000 of the Reliastar Policy[7] proceeds for a period of 8 years.

The terms of the MSA also required decedent to do the following within 10 days of the entry of the judgment for dissolution: (1) provide Ms. Kahanic with a copy of the AIG policy; (2) notify, in writing, AIG of his obligations under the

---

[6] The AIG policy secured decedent's child support obligation. At some point that is not clear from the record decedent transferred ownership of the AIG policy to an irrevocable life insurance trust. Upon decedent's death Ms. Kahanic received the $3 million death benefit as trustee of the irrevocable life insurance trust. The parties agree that the taxation of the AIG policy is not at issue.

[7] The MSA required decedent to name Ms. Kahanic as an irrevocable beneficiary on a policy enumerated in "Exhibit 2", a document attached to the MSA that listed Ms. Kahanic's and decedent's life insurance policies then in effect. Because decedent listed only the AIG policy, which he used to secure his child support obligation, and the Reliastar policy (decedent hid from Ms. Kahanic the Prudential policy), the terms of the MSA obligated decedent to use the Reliastar policy as security for the spousal maintenance obligation.

MSA and provide Ms. Kahanic with a copy of the notice; and (3) execute and deliver documents designating Ms. Kahanic as an irrevocable beneficiary to $500,000 of life insurance proceeds to secure his unpaid spousal maintenance payments (collectively, the "insurance requirements").

The final page of the judgment for dissolution states that "this Court expressly retains jurisdiction of this cause for the sole and exclusive purpose of enforcing all the terms of this Judgment for Dissolution of Marriage, including all the terms of the [MSA] made in writing."

Decedent's Noncompliance With the MSA and the September 16, 2004, Agreed Order

By August 2004 decedent had not complied with the insurance requirements. Ms. Kahanic, knowing that decedent had missed a life insurance premium payment in 2002,[8] worried increasingly that decedent had not been paying his life insurance premiums. She believed that if decedent let his life insurance policies lapse and then passed away on account of his illness she might not be able to collect child support and spousal maintenance. Maricarol Lacy and Bernard B. Rinella, Ms. Kahanic's attorneys, attempted to have decedent comply

---

[8] See supra p. 5.

with the insurance requirements on his own volition, but eventually Ms. Kahanic had to seek resolution through the circuit court.

On August 16, 2004, Ms. Kahanic filed a petition for a rule to show cause for indirect civil contempt, motion to compel and for other relief (petition to show cause). The petition to show cause stated, inter alia, that decedent had not complied with the insurance requirements. Ms. Kahanic requested that the circuit court find decedent in indirect civil contempt for his refusal to comply with the insurance requirements, and upon such finding compel decedent to comply with the insurance requirements. Ms. Kahanic also asked the circuit court to compel decedent to pay her attorney's fees.

Before the circuit court acted on Ms. Kahanic's petition to show cause, Ms. Kahanic and decedent reached an agreement with respect to his noncompliance with the insurance requirements. Ms. Kahanic agreed to not immediately pursue a finding of indirect civil contempt against decedent for his noncompliance with the insurance requirements in exchange for decedent's entering into an agreed order stating that (1) Ms. Kahanic and the children remained the sole beneficiaries on the AIG and Reliastar policies and (2) decedent would not alter the policies until he complied with the insurance requirements. Ms. Kahanic's decision was based in part on her understanding that if decedent died without complying with the

insurance requirements she would receive the Reliastar policy's full $2,495,000 death benefit.

On September 9, 2004, Ms. Kahanic filed a motion for entry of agreed order relating to her petition to show cause and her and decedent's agreement. On September 16, 2004, the circuit court entered an agreed order (September 16 agreed order), which read as follows:

> This matter having come before the Court for enforcement and compliance with the Marital Settlement Agreement and Judgment for Dissolution of Marriage:
>
> IT IS HEREBY ORDERED;
>
> * * * [Decedent] represents that * * * [Ms. Kahanic] and the children remain as sole beneficiaries on each of his life insurance policies as identified specifically in the parties' executed Marital Settlement Agreement at Articles V [Life Insurance Coverage For The Children] and VI [Life Insurance Coverage to Secure Maintenance] and attached as Exhibit "2" to said Agreement and that these policies have not been transferred, modified[,] altered or encumbered in any way, shape or form, and no transfers, modifications, alterations or encumbrances on said policies will occur until * * * [decedent] complies with the terms of the Settlement Agreement regarding these policies.

The attorneys for decedent and Ms. Kahanic signed the September 16 agreed order on their clients' behalf.

On August 11, 2005, decedent passed away.  He had not complied with the insurance requirements, and the September 16 agreed order had not been vacated.[9]

Reliastar Policy

The Reliastar policy was a universal life insurance policy.  Ms. Kahanic was the Reliastar policy's primary beneficiary when decedent passed away, and accordingly she received the $2,495,000 death benefit upon his death.  As of the date of decedent's death the Reliastar policy had an accumulated value of

---

[9] During the nearly 11 months between the time the circuit court entered the September 16 agreed order and decedent's death the circuit court continued the matter of Ms. Kahanic's petition to show cause numerous times.  The circuit court first continued the matter until November 16, 2004, and then did so again until December 20, 2004.  On December 20, 2004, the circuit court entered an order requiring decedent to, inter alia, demand copies of his life insurance policies and setting a status conference for Ms. Kahanic's petition to show cause for January 24, 2005.  Decedent complied with the circuit court's order to demand copies of his life insurance policies, but by the status conference he had received information on only one policy.  The circuit court then entered an agreed order requiring decedent to continue to gather the life insurance policies and setting a status conference on Ms. Kahanic's petition to show cause for March 3, 2005.  The circuit court continued the status conference to April 7, 2005, and continued it again to May 16, 2005.  At the May 16, 2005, status conference the circuit court set Ms. Kahanic's petition to show cause for hearing on July 26, 2005.  At the July 26, 2005, hearing the circuit court continued the "issue as to finalizing life insurance terms as required by the judgment" until August 25, 2005, and required decedent to provide Ms. Kahanic with beneficiary information within 21 days.

$31,165.84[10] and a surrender charge of $43,573.16.[11] Decedent's premium payments provided him with coverage through September 1, 2005.

The Reliastar policy contained a no-lapse provision. The terms of the policy stated that so long as decedent's total premium payments exceed the "cumulative total of the 'Minimum Monthly Premiums' in effect from the 'Policy Date' to the end of the current period" the Reliastar policy would remain in effect, regardless of net cash surrender value. When decedent died he had made premium payments of $43,573.16. The policy's minimum monthly premium was $1,024.22, and the cumulative total of the monthly premiums beginning on the policy date (March 1, 2004) to the end of the current period (August 31, 2005) was $18,435.96.

Decedent's Will and Declaration of Trust

Decedent's will was admitted to probate by the circuit court. Mr. Fiala was appointed executor of the estate on August 23, 2005, and continues to act in that

---

[10] The policy's accumulated value was calculated by totaling all premium payments made, subtracting all monthly fees and expenses incurred, and adding earned interest.

[11] The policy's surrender charge was the lesser of (1) total premium payments made, i.e., $43,573, or (2) approximately $66,292, the amount calculated by multiplying the policy's stated value of $2,495,000 by the policy's "maximum surrender fee per $1,000" of $26.57 and dividing by 1,000.

role.[12]  Decedent's children received certain personal property under the will, and decedent's will named the Declaration of Trust of David Kahanic (Declaration of Trust) the residuary legatee.  The Declaration of Trust was never funded, and its value was zero on the date of decedent's death.  Decedent's children are the beneficiaries of the Declaration of Trust.

Decedent's will stated that all Federal and Illinois estate taxes were to be paid from the residuary estate, and if the residuary estate did not contain sufficient assets to cover the tax liabilities, from the Declaration of Trust.  The will did not mention how taxes were to be paid if the residuary estate and the Declaration of Trust lacked the necessary assets to pay the estate's taxes.  Both decedent's will and the Declaration of Trust waived contribution from third-party transferees toward the payment of the estate's tax liabilities.[13]

The Estate's Tax Returns

Mr. Fiala hired the accounting firm Levine Hahn Kilcoyne, LLP (Levine Hahn), to handle the estate's finances and prepare its Form 706 and Form 700, State of Illinois Estate & Generation Skipping Transfer Tax Return.  The estate's

---

[12]  See supra note 4.

[13]  Pursuant to decedent's will and the Declaration of Trust Mr. Fiala did not seek contribution from Ms. Kahanic with respect to the estate's tax liabilities.

Federal and Illinois estate taxes and tax returns were due on May 11, 2006. The estate filed Form 4768, Application for Extension of Time To File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes, requesting an automatic six-month extension to file its Form 706. At the same time the estate filed a copy of its Form 4768 with the State of Illinois and obtained a six-month extension to file its Form 700.

Notwithstanding the automatic six-month extensions, the estate was required to pay the taxes owed by May 11, 2006, to avoid penalties. Levine Hahn prepared draft returns and determined that the estate should pay Federal estate taxes of $775,000 and Illinois estate taxes of $195,000. These amounts exceeded what Levine Hahn believed to be the estate's true tax liabilities, but Levine Hahn wanted to ensure that if the estate recovered additional assets before it filed its tax returns the estimated tax payments would cover any additional tax liabilities and prevent the imposition of penalties.

Collecting the Estate's Assets

In early May 2006 the estate did not have sufficient liquid assets to pay the $970,000 in estimated Federal and Illinois estate taxes. The estate did hold illiquid assets that, coupled with the liquid assets, would have allowed the estate to

pay the estimated taxes without borrowing funds. When the taxes became due,

however, the illiquid assets were not yet available to pay the estate's taxes.[14]

---

[14] Immediately before receiving a loan and paying the estate's estimated Federal and Illinois estate taxes, the estate believed that it had the following assets, asset values, and liabilities:

| Assets | Values |
|---|---|
| Liquid assets: | |
| Cash | $406,430 |
| Illiquid assets: | |
| AEPS--net asset value per 706 | 230,753 |
| Income tax refund receivable (2005) | |
| Federal | 32,711 |
| Illinois | 1,178 |
| Due from AEPS | |
| Unpaid compensation for 2005 | 171,111 |
| Shareholder net advances to corporation | 33,415 |
| AEPS defined benefit plan | 163,876 |
| AEPS money purchase pension plan | 68,742 |
| Unclaimed property receivable (Ill.) | 147 |
| Federal estate tax refund receivable | 139,032 |
| Illinois estate tax refund receivable | 27,150 |
| Total illiquid assets | 868,115 |
| | |
| Total assets | 1,274,545 |

Liabilities

| | |
|---|---|
| Federal and Illinois estate tax liabilities (estimated) | 970,000 |
| Federal and Illinois income tax liabilities on income in respect of decedent | 89,095 |
| Amount owed to AEPS for the estate's | 43,352 |

(continued...)

The estate's two most valuable nonliquid assets, the net value of AEPS and decedent's unpaid compensation for 2005, were tied up in decedent's medical practice. John Argo, decedent's former business adviser, advised Mr. Fiala that selling AEPS as a going concern would bring the estate the most money. By the time the estate needed to pay its tax liabilities Mr. Fiala had not been able to find a buyer for AEPS despite assurances from Mr. Argo that the estate would be able to sell the practice as a going concern.

Additionally, Mr. Fiala, acting on the advice of Levine Hahn and Mr. Argo, had not disbursed to the estate any of AEPS' available funds.[15] He made this decision in part after learning of two potential medical malpractice claims against decedent. Although decedent carried medical malpractice insurance, Mr. Fiala was not sure at that time whether decedent's medical malpractice insurance was in

---

[14](...continued)
expenses paid by AEPS

| | |
|---|---|
| Accrued accounting and legal fees | 22,600 |
| Total liabilities | 1,125,047 |

[15] AEPS had only $117,364 in cash. Its most valuable asset was $443,396 in accounts receivable which were in the process of being collected. As for significant liabilities, AEPS owed Harris Bank $115,000 on a line of credit and decedent $212,269 (comprising his 2005 compensation and a loan he had made to AEPS) and was aware of two potential medical malpractice lawsuits and the possibility of decedent's former staff suing the practice. Mr. Fiala did not collect decedent's unpaid compensation, the advances that he had made to AEPS, and the money in decedent's defined benefit and pension plans until November 2006.

effect. Mr. Fiala also learned that decedent's former employees were considering a potential lawsuit related to Mr. Fiala's attempts to sell AEPS as a going concern. All of this factored into Mr. Fiala's decision to not disburse to the estate the limited funds AEPS had.

Thus, with limited cash on hand and desiring to avoid a forced sale of AEPS, the estate made the decision that it needed to borrow money in order to timely pay its Federal and Illinois estate taxes.

## Ms. Kahanic Lends the Estate $700,000

Levine Hahn, knowing that Ms. Kahanic had funds available to lend to the estate, advised Mr. Fiala to seek a loan from her. Mr. Fiala also believed that borrowing money from Ms. Kahanic made sense because the estate was still gathering information as to its assets, the estate's taxes were almost due, and borrowing money from a bank or other commercial lender would take time. Mr. Fiala thought that borrowing from Ms. Kahanic was the "only practical solution * * * [the estate] had".

On May 5, 2006, Ms. Kahanic agreed to lend the estate $700,000[16] at the short term applicable Federal rate (4.85%).[17] Ms. Kahanic and Mr. Fiala[18] signed a promissory note and security agreement (note) containing the terms of the loan. The note stated that the loan could be prepaid at any time without penalty and all repayments would be applied first to interest. The note also stated that unpaid interest would be added to principal each year and all unpaid interest and principal would be due on May 5, 2009. If the loan was not repaid by May 5, 2009, the interest rate would be reset to the short term applicable Federal rate as of May 5, 2009.

To secure repayment of the debt, the estate granted Ms. Kahanic a security interest in all of its "accounts, deposit accounts, securities, securities accounts, investment property, promissory notes, payment intangibles, general intangibles, proceeds of the above, and all such collateral hereafter acquired". The estate also granted Ms. Kahanic a security interest in any future Federal or Illinois estate tax refunds due to the estate and agreed to immediately transfer any such refund to Ms.Kahanic. On May 15, 2006, Ms. Kahanic filed a Uniform Commercial Code

[16] Levine Hahn advised Mr. Fiala as to the amount of the loan.

[17] The estate used the borrowed funds and $270,000 of its own available cash to timely pay its estimated Federal and Illinois estate taxes.

[18] Mr. Fiala signed the note on the estate's behalf.

financing statement with the Illinois secretary of state perfecting her security interest in the collateral stated in the note.

The Estate's Tax Returns and Respondent's Deficiency Determination

On November 13, 2006, the estate timely filed its Form 706.[19] The estate reported on Schedule D, Insurance on the Decedent's Life, the $2,495,000 Reliastar policy and included the full amount in calculating the value of the gross estate. The estate also reported the $2,495,000 Reliastar policy on Schedule K, Debts of the Decedent, and Mortgages and Liens, and reduced the value of the gross estate by such amount. On the Schedule K the estate stated "indebtedness in respect of property included in the gross estate pursuant to Internal Revenue Code Sections 2053(a)(4), 2053(e), 2043(b)(2) and 2516" as its reason for entitlement to the deduction. Respondent determined that the estate was not entitled to deduct any of the $2,495,000 that Ms. Kahanic received as beneficiary of the Reliastar policy, but has since conceded that the estate may deduct the $500,000 as to which the MSA obligated decedent to name Ms. Kahanic irrevocable beneficiary.

---

[19] The Federal estate tax return reported a tax liability of $635,968. Because the estate had previously paid $775,000, it requested a refund of $139,032, which the IRS issued to the estate on December 18, 2006. The estate also timely filed its Illinois return. The Illinois return indicated that the estate had previously overpaid its taxes by $27,150.

Additionally, the estate reported on Schedule J, Funeral Expenses and Expenses Incurred in Administering Property Subject to Claims, one year's worth of interest on the loan, $34,730, and claimed a deduction in that amount under section 2053(a)(2).[20] The description of the expense states that the loan was necessary "to provide cash for payment of Federal and Illinois estate taxes." Respondent determined that the interest on the loan was not an allowable deduction because the loan could be prepaid and the actual amount of interest the estate might pay could not be determined with certainty.

Loan Repayment and Condition of the Estate at Time of Trial

When Ms. Kahanic lent the estate $700,000 to allow the estate to pay its taxes, she expected to be repaid and believed that the estate had sufficient assets to repay the loan in full. However, the position of the estate has deteriorated significantly since May 5, 2006, and as of the date of trial the estate had not made a single payment toward the loan.[21] Specifically, the estate was unable to sell

---

[20] The interest was calculated for the period beginning May 5, 2006, and ending May 13, 2007 (six months after the filing of the Federal return). As of July 31, 2010, the accrued interest totaled $100,756.

[21] For 12 months after decedent died, decedent's bank account continued to automatically transfer to Ms. Kahanic's his $7,000 monthly maintenace obligation. As a result, Ms. Kahanic owed the estate $84,000. When Ms. Kahanic and Mr. Fiala realized the mistake, they agreed to reduce the principal amount of the loan

(continued...)

AEPS as a going concern and instead was forced to liquidate the practice for substantially less money than the estate believed it would receive at the time Ms. Kahanic made the loan. Additionally, the estate owed significant legal and accounting fees that it did not expect to be responsible for when it agreed to the terms of the loan.[22] Ms. Kahanic has not demanded repayment of the loan.

_____

[21](...continued)
from $700,000 to $616,000.

[22] The estate's assets and liabilities as of July 31, 2010, were as follows:

| Assets | Values |
| --- | --- |
| Cash | $417,328 |
| Illinois estate tax refund receivable | 27,150 |
| Federal income tax receivable (7/31/07) | 24,349 |
| Illinois income tax refund receivables: | |
| July 31, 2007 | 2,087 |
| July 31, 2009 | 300 |
| Estate tax benefits (estimated) of deductible expenses not reported on the estate's tax returns: | |
| Incurred legal and accounting fees of $193,000 | 98,985 |
| Accrued interest of $66,025 on loan from Ms. Kahanic | 33,694 |
| Total assets | 603,893 |

Liabilities

Loan from Ms. Kahanic:

(continued...)

OPINION

We are asked to decide whether the estate must include in the value of the gross estate the Reliastar policy's $2,495,000 life insurance proceeds, and, if so, whether the estate is entitled to deduct the same amount as indebtedness owed to Ms. Kahanic.[23] We also must decide whether the estate may deduct the accrued interest on the loan Ms. Kahanic made to the estate and whether the estate may deduct accountant's and attorney's fees that the estate incurred after it filed its Form 706.

I. Agreed Order and the Circuit Court's Jurisdiction

We begin with the standards governing agreed orders and an Illinois trial court's jurisdiction to enter such orders. Under Illinois law, "An agreed order, also termed a consent order or a consent decree, is not an adjudication of the

---

[22](...continued)

| | |
|---|---|
| Principal | 616,000 |
| Accrued interest | 100,756 |
| Due to the [child] Kahanic Trust | 20,864 |
| Due to the [child] Kahanic Trust | 20,864 |
| Accrued accounting fees (estimated) | 10,000 |
| Accrued legal fees (estimated) | 10,000 |
| | |
| Total liabilities | 778,484 |

[23] As mentioned supra p. 18, respondent concedes that the estate is entitled to deduct, under sec. 2053, the $500,000 as to which decedent was obligated under the MSA to name Ms. Kahanic irrevocable beneficiary.

parties' rights but, rather, a record of their private, contractual agreement. Once such an order has been entered, it is generally binding on the parties". In re Marriage of Rolseth, 907 N.E.2d 897, 900 (Ill. App. Ct. 2009) (citations omitted). "A consent decree reflects the determination of the parties to end their controversy. It is like a written contract and should be enforced as written." Filosa v. Pecora, 309 N.E.2d 356, 359 (Ill. App. Ct. 1974). "A valid consent decree is binding upon the parties and is enforceable as are other judgments." Comet Cas. Co. v. Schneider, 424 N.E.2d 911, 915 (Ill. App. Ct. 1981). However, an agreed order "is void if the court lacked jurisdiction over either the subject matter or the parties to a suit." Filosa, 309 N.E.2d at 360.

In In re Marriage of Adamson, 721 N.E.2d 166, 172 (Ill. App. Ct. 1999), the Appellate Court of Illinois, Second District, discussed a trial court's jurisdiction in a dissolution proceeding:

> Generally, a trial court loses jurisdiction in a dissolution action 30 days after it enters a final order. However, a trial court retains jurisdiction to enforce its order past 30 days when the judgment orders or contemplates further performance by the parties. In a dissolution action the trial court retains extraordinary continuing jurisdiction not applicable to civil cases generally. * * * [Citations omitted.]

Despite a trial court's jurisdictional reach to enforce its own orders, the court does not have jurisdiction "to engraft new obligations onto the" divorce

decree.  Id.  However, if a party invokes the trial court's continuing jurisdiction to enforce the terms of the divorce decree, for example by petitioning the court for a rule to show cause against the other party, and the parties subsequently agree to a modification of the divorce decree that imposes new obligations, the trial court has jurisdiction to enter the modified agreement and enforce it as part of its continuing power to enforce the divorce decree.  Id. at 173.  "The parties are in the best position to evaluate their own circumstances, and they should be allowed to resolve their dispute by agreement even when the trial court would not, or could not, order the same resolution."  Id.

The estate argues that the September 16 agreed order was an agreement between decedent and Ms. Kahanic that modified the provision in the MSA requiring decedent to secure his unpaid spousal maintenance with $500,000 of life insurance proceeds.  Respondent counters that the September 16 agreed order was a civil contempt order or a security agreement and not a modification of the MSA.  Respondent also argues that even if we consider the September 16 agreed order to be a modification of the MSA, In re Marriage of Arkin, 438 N.E.2d 957 (Ill. App. Ct. 1982), and In re Marriage of Hubbard, 574 N.E.2d 860 (Ill. App. Ct. 1991), hold that a court does not have jurisdiction to enter an order modifying the parties' obligations in a proceeding for enforcement of that decree.  Respondent

acknowledges the holding of <u>In re Marriage of Adamson</u>, but contends that the decision by the Appellate Court, Second Division, in that case did not expressly overrule the holdings of <u>In re Marriage of Arkin</u> and <u>In re Marriage of Hubbard</u>.[24]

While we agree with respondent that the September 16 agreed order was intended to force decedent to comply with the insurance requirements as originally stated in the MSA, we also believe that the September 16 agreed order modified the MSA. Before the circuit court entered the September 16 agreed order, Ms. Kahanic had, pursuant to the MSA, an enforceable claim to receive at most $500,000 had decedent died before completing his spousal maintenance obligation. Additionally, decedent had the legal right to name someone other than Ms. Kahanic as beneficiary to the remaining policy proceeds. However, once the circuit court entered the September 16 agreed order and until decedent complied

---

[24] We find respondent's reliance on <u>In re Marriage of Arkin</u>, 438 N.E.2d 957 (Ill. App. Ct. 1982), and <u>In re Marriage of Hubbard</u>, 574 N.E.2d 860 (Ill. App. Ct. 1991), to be misplaced. Neither case cited by respondent involved a trial court entering or enforcing an agreement of the parties. <u>See</u> <u>In re Marriage of Hubbard</u>, 574 N.E.2d at 860 (trial court's order requiring husband to pay a portion of ex-wife's home repair costs amounted to a modification of the parties' judgment for dissolution that the trial court lacked jurisdiction to enter); <u>In re Marriage of Arkin</u>, 438 N.E.2d at 957 (trial court could not modify property settlement to force wife to pay one-half of the mortgage after she vacated the marital residence). Thus, while <u>In re Marriage of Adamson</u>, 721 N.E. 2d 166 (Ill. App. Ct. 1999), may not have expressly overruled either case, the facts of the matter before us clearly fall within the framework of <u>In re Marriage of Adamson</u>. Accordingly, we follow its analysis.

with the insurance requirements, Ms. Kahanic was entitled to receive the full amount of the policy proceeds and decedent had no legal right to amend the Reliastar policy in any way. Viewing the parties' legal rights before and after the circuit court entered the September 16 agreed order leads us to conclude that the September 16 agreed order modified the MSA.

We also find that the circuit court had jurisdiction to enter the September 16 agreed order as a modification of the MSA. Ms. Kahanic invoked the circuit court's jurisdiction when she filed the petition to show cause, which, among other things, asked the circuit court to use its compel powers to force decedent to comply with the insurance requirements stated in the MSA. See In re Marriage of Adamson, 721 N.E.2d at 173 ("Respondent invoked the trial court's continuing jurisdiction to enforce petitioner's obligation to refinance the home equity loan secured by the marital residence"). Decedent and Ms. Kahanic then agreed to the terms of the September 16 agreed order and asked the circuit court to enter the agreement, which it did. Although the September 16 agreed order imposed additional obligations on decedent that the circuit court lacked jurisdiction to impose on its own, the circuit court had jurisdiction to enter and enforce the September 16 agreed order because the parties agreed to its terms. See id. Thus, the circuit court properly entered the September 16 agreed order as part of its

- 26 -

continuing power to enforce the judgment for dissolution and as a modification of

the MSA.  See id. ("[W]hen the parties agree to settle a postdecree dispute by

modifying the underlying judgment or martial settlement agreement, the trial court

should enforce the new agreement unless it is unconscionable.").

II. Whether the Estate Must Include the Reliastar Policy Proceeds in the Value of
    the Gross Estate

    A.  General Rules and Section 2042(2)

Section 2001(a) imposes a tax "on the transfer of the taxable estate of every

decedent who is a citizen or resident of the United States."  Section 2051 defines

the taxable estate as "the value of the gross estate" less applicable deductions.

Section 2031(a) specifies that the gross estate comprises "all property, real or

personal, tangible or intangible, wherever situated", to the extent provided in

sections 2033 through 2046.  Section 2033 broadly provides:  "The value of the

gross estate shall include the value of all property to the extent of

the interest therein of the decedent at the time of his death."  Sections 2034 through

2046 explicitly mandate the inclusion of several more narrowly defined classes of

interests in property.  Among those specific sections is section 2042, which governs

the treatment of life insurance proceeds and provides in pertinent part as follows:

SEC. 2042.  PROCEEDS OF LIFE INSURANCE.

The value of the gross estate shall include the value of all property--

\*      \*      \*      \*      \*      \*      \*

(2) Receivable by other beneficiaries.--To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person.  For purposes of the preceding sentence, the term "incident of ownership" includes a reversionary interest (whether arising by the express terms of the policy or other instrument or by operation of law) only if the value of such reversionary interest exceeded 5 percent of the value of the policy immediately before the death of the decedent.  As used in this paragraph, the term "reversionary interest" includes a possibility that the policy, or the proceeds of the policy, may return to the decedent or his estate, or may be subject to a power of disposition by him.  The value of a reversionary interest at any time shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, pursuant to regulations prescribed by the Secretary.  In determining the value of a possibility that the policy or proceeds thereof may be subject to a power of disposition by the decedent, such possibility shall be valued as if it were a possibility that such policy or proceeds may return to the decedent or his estate.

Section 20.2042-1(c)(2), Estate Tax Regs., expounds on the term "incidents of

ownership":

For purposes of this paragraph, the term "incidents of ownership" is not limited in its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has reference to the right of the insured or his estate to the economic benefits of the policy.  Thus, it includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to

obtain from the insurer a loan against the surrender value of the policy, etc.
* * *

Thus, if decedent possessed at his death any incidents of ownership in the Reliastar policy, the entire $2,495,000 death benefit is includible in the value of the gross estate pursuant to section 2042(2).

B. Parties' Arguments

The estate argues that at the time of decedent's death he did not possess any incidents of ownership in the Reliastar policy and therefore the proceeds are not includible in the value of the gross estate. See sec. 2402(2). The estate reasons that as a result of the September 16 agreed order (1) decedent could not exercise the economic benefits of the policy (e.g., change the beneficiary or cancel the policy) and (2) the value of decedent's reversionary interest did not exceed 5% of the value of the policy. Respondent argues that decedent had a reversionary interest and the estate has not shown that the value of decedent's reversionary interest did not exceed 5% of the value of the Reliastar policy. See id.

C. Decedent's Reversionary Interest

Regardless of the limitations imposed on decedent by the September 16 agreed order, if the value of decedent's reversionary interest in the Reliastar policy exceeded 5% of the policy's value, the policy proceeds are includible in the gross

estate under section 2042(2).  See supra p. 27.  The estate concedes that decedent had a reversionary interest.  The estate also concedes that if we determine that the Reliastar policy had a fair market value in excess of zero, it has not introduced evidence that would allow us to find that the value of decedent's reversionary interest did not exceed 5% of the policy's value.[25]

The estate argues, however, that the best approximation of the Reliastar policy's value is its net cash-surrender value of zero.  Thus, the estate contends that a 5-percent or more reversionary interest would have no value, and decedent's reversionary interest would not constitute an "incident of ownership".  See Estate of Beauregard v. Commissioner, 74 T.C. 603, 610 n.5 (1980) ("Since * * * [the decedent's] coverage in the group policy had no ascertainable value prior to death, a 5-percent or more reversionary interest would have no value.")  Respondent argues that net cash-surrender value is not the fair market value of the policy.

Generally, the value of every item of property includible in the decedent's gross estate is its fair market value at the time of the decedent's death.  Sec. 20.2031-1(b), Estate Tax Regs.  "The fair market value is the price at which the

---

[25] Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The estate does not argue that respondent should bear the burden of proof.

property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." Id. The fair market value is not to be determined by a forced sale price. Id. When valuing a life insurance policy that has been in force for some time and requires further premium payments to be made, the value may be approximated by making adjustments to the interpolated terminal reserve.[26] See sec. 20.2031-8(a)(2), Estate Tax Regs.; sec. 25.2512-6(a), Gift Tax Regs. This method may not be used, however, if "because of the unusual nature of the contract such an approximation is not reasonably close to the full value of the contract". Sec. 20.2031-(8)(a)(2), Estate Tax Regs.

The estate claims that "The [interpolated terminal] reserve value of the policy is essentially the 'Accumulated Value' of the policy." As of August 15, 2005, the accumulated value of the policy was $31,165.84. The estate argues,

---

[26] The valuation calls for "adding to the interpolated terminal reserve at the date of the decedent's death the proportionate part of the gross premium last paid before the date of the decedent's death which covers the period extending beyond that date." Sec. 20.2031-8(a)(2), Estate Tax Regs. The interpolated terminal reserve "'is not cash surrender value; it is the reserve which the insurance company enters on its books against its liability on the contracts. * * * The word "interpolated" simply indicates adjustment of the reserve to the specific date in question.'" Matthies v. Commissioner, 134 T.C. 141, 153 n. 12 (2010) (quoting Commissioner v. Edwards, 135 F.2d 574, 576 (7th Cir. 1943), affg. 46 B.T.A. 815 (1942)).

however, that because decedent's policy was in force for only 18 months before his death and had a surrender charge of $43,573.16, the policy should be valued at its net cash-surrender value of zero and not its accumulated value of $31,165.84.

Respondent argues that net cash-surrender value represents the policy's forced sale or liquidation value and not the fair market value of the policy. Respondent contends that the policy's interpolated terminal reserve, which the estate claims is the same as the policy's accumulated value, is the proper value for the Reliastar policy.

Initially, we note that our obligation does not extend to determining the exact value of the Reliastar policy, but only to deciding whether the Reliastar policy was worthless at the time decedent died.[27] We also note that despite the estate's claim that the Reliastar policy's accumulated value "is essentially the" interpolated terminal reserve of the policy, we find no evidence of this in the terms of the policy or in any of the documents provided to the estate by AIG after decedent's death. The policy generally defines "accumulated value" as the total premium payments made minus all monthly fees and expenses plus earned interest. While the accumulated value may approximate the amount which the

---

[27] See supra p. 29.

company enters on its books against its liability on the contracts, neither party has presented evidence that suggests this is the case.

The estate's main argument is that if we do not consider the surrender charges in valuing the Reliastar policy we will overstate the fair market value of the policy. In any event, the fact that decedent (or any other owner) had no access to the savings or investment portion of the policy as of the date of his death does not make the policy worthless. See Schwab v. Commissioner, 136 T.C. 120 (2011) (finding life insurance policies to have fair market values despite the polices' net cash-surrender values of zero). "Surrender of a policy represents only one of the rights of the insured", albeit a significant one. Guggenheim v. Rasquin, 312 U.S. 254, 257 (1941).

In Schwab v. Commissioner, 136 T.C. 120, we were faced with deciding the "amounts actually distributed" under section 402(b) when taxpayers received life insurance policies from a nonqualified employee-benefit plan that, like the life insurance policy here, had surrender charges in excess of their stated values. Id. at 125. The policies in Schwab also were similar to the Reliastar policy in that the policies were universal life insurance policies, had been in effect before the date of disposition, and required further premium payments. Id. at 123-124.

In Schwab we first decided that the policies' fair market values constituted the "amounts actually distributed". Id. at 131. We then concluded that the only significant value the policies had was the amount of insurance coverage that was attributable to the premium payments previously made by the employer,[28] and we determined that the fair market values of the life insurance policies were $1,900.33 and $765.62 by multiplying the number of remaining days the policies covered the taxpayers as of the date of distribution by the base rates for the guaranteed maximum monthly cost of insurance rates. Id. at 135-136.

Here, decedent's final premium payment provided him with coverage until September 1, 2005. Thus, as of the date of decedent's death, the Reliastar policy would have provided 20 days' more coverage. Following our reasoning in Schwab, the Reliastar policy's fair market value as of August 11, 2005, would at least be the cost of insuring decedent for 20 days, or $390.79.[29]

---

[28] Similar to the situation before us, in Schwab v. Commissioner, 136 T.C. 120 (2011), we lacked evidence in the record of the insurer's policy reserves. See id. at 133.

[29] The cost of insuring decedent for 20 days is determined as follows: .23833 (base rate per thousand dollars of coverage for the guaranteed maximum monthly cost of insurance) x 2,495 (amount of coverage divided by $1,000) gives us a monthly benefit of $594.63. Multiplying the monthly benefit by 12 months results in an annual benefit of $7,135.56. We then determine the benefit of insuring decedent for 20 days by taking the annual benefit and multiplying it by

(continued...)

Moreover, unlike the policies in Schwab, the Reliastar policy's no-lapse provision had not expired (or even kicked in) at the time of decedent's death. The terms of the Reliastar policy stated that so long as decedent's total premium payments exceed the "cumulative total of the 'Minimum Monthly Premiums' in effect from the 'Policy Date' to the end of the current period" the Reliastar policy would remain in effect, regardless of net cash surrender value. When decedent died he had made premium payments of $43,573.16. The policy's minimum monthly premium was $1,024.22, and the cumulative total of the minimum monthly premiums beginning on the Policy Date (March 1, 2004) to the end of the current period (August 31, 2005) was $18,435.96. Thus, because of the no-lapse provision and decedent's total premium payments, the Reliastar policy would have remained in effect until September 1, 2007--more than two years after decedent

[29](...continued)
the fraction of 20/365. This calculation results in a value of $390.79. See Schwab v. Commissioner, 136 T.C. at 135 n.21.

died--without a premium payment being made.[30] We believe this adds a significant amount of value to the Reliastar policy.

The estate's only argument with respect to the value of decedent's reversionary interest is that the policy was worthless. The estate admits that it did not introduce any evidence that would allow us to conclude that the value of decedent's reversionary interest was less than 5% of the value of the Reliastar policy. Thus, having determined that the Reliastar policy had a fair market value in excess of zero, it follows that the full amount of the Reliastar policy proceeds are includible in the value of the gross estate under section 2042(2).

III. Whether the Estate Is Entitled to Deduct the Reliastar Policy Proceeds Under Section 2053(a)(4)

Generally, section 2053(a)(4) allows a deduction from the gross estate for indebtedness that encumbers property the value of which, undiminished by such indebtedness, is included in the gross estate.[31] In Estate of Robinson v.

---

[30] It would have taken more than 24 months for the cumulative total of the minimum monthly payments to exceed the total premium payments made and cause the Reliastar policy to lapse. This is shown by dividing $25,137.20 (total premium payments made of $43,573.16 - cumulative total of minimum monthly payments as of August 31, 2005, of $18,435.96) by $1,024.22 (the Reliastar policy's minimum monthly premium) for a total of 24.543 months.

[31] Sec. 2053(a)(4) provides in part as follows:

(continued...)

Commissioner, 63 T.C. 717 (1975), we held that where (1) a property settlement agreement entered into in the context of divorce proceedings obligates one party to name the other party as a beneficiary to life insurance proceeds; (2) the obligee receives the life insurance proceeds upon the death of the obligor; and (3) the obligor's estate includes the life insurance proceeds in the value of the gross estate, the obligor's estate may deduct as indebtedness under section 2053(a)(4) the amount of the life insurance proceeds the obligor was required to provide under the divorce decree.  See sec. 2053(a)(4); see also Rev. Rul. 76-113, 1976-1 C.B. 276.

The estate argues that it is entitled to deduct the full amount of the Reliastar policy proceeds as indebtedness in respect of property included in the gross estate. See sec. 2053(a)(4).  The estate reasons that the September 16 agreed order increased the indebtedness encumbering the policy from $500,000 to $2,495,000 and the estate included the full value of the Reliastar policy in the gross estate.

---

[31](...continued)
For purposes of the tax imposed by sec. 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts for * * * any indebtedness in respect of[] property where the value of the decedent's interest therein, undiminished by such * * * indebtedness, is included in the value of the gross estate, as are allowable by the laws of the jurisdiction * * * under which the estate is being administered.

Section 2053(c)(1)(A) limits the deduction for indebtedness in respect of property included in the gross estate when the indebtedness was founded on a promise or agreement. In such a situation the deduction under section 2053(a)(4) is permitted only to the extent that the indebtedness was contracted bona fide and for an adequate and full consideration in money or money's worth. Sec. 2053(c)(1)(A).

An exception to the "adequate and full consideration in money or money's worth" requirement exists where the transfer of property occurs pursuant to certain property settlements. Secs. 2043(b)(2), 2516. Section 2043(b)(2) provides that for purposes of the deduction provided by section 2053(a)(4), a transfer of property that satisfies section 2516(1) shall be considered to be made for an adequate and full consideration in money or money's worth. Section 2516 provides in part as follows:

> Where a husband and wife enter into a written agreement relative to their marital and property rights and divorce occurs within the 3-year period beginning on the date 1 year before such agreement is entered into (whether or not such agreement is approved by the divorce decree), any transfers of property or interests in property made pursuant to such agreement * * * to either spouse in settlement of his or her marital or property rights * * * shall be deemed to be transfers made for a full and adequate consideration in money or money's worth.

The estate argues that "The September 16, 2004 Agreed Order constitutes an agreement settling Decedent's and * * * [Ms. Kahanic's] marital and property rights entered into within the time frame required by * * * [section] 2516." Therefore, the estate argues that decedent's obligation to maintain Ms. Kahanic as the sole beneficiary of the Reliastar policy proceeds and subsequent transfer to her of the policy proceeds is deemed to be made for a full and adequate consideration in money or money's worth under section 2043(b)(2). We agree.

To begin, we believe that the September 16 agreed order is a settlement agreement relative to decedent's and Ms. Kahanic's marital and property rights.[32] Moreover, as discussed supra, the September 16 agreed order modified the MSA. Thus, regardless of whether we view the transfer of the Reliastar policy proceeds to Ms. Kahanic as being made pursuant to the MSA (as amended by the September 16 agreed order) or the September 16 agreed order, it would be made pursuant to an agreement in settlement of marital or property rights within the purview of section 2516(1). Accordingly, the exception under section 2043(b)(2) is met, and the

---

[32] The September 16 agreed order was entered into within the timeframe required by sec. 2516(1).

transfer of the Reliastar policy proceeds is considered to be made for an adequate and full consideration in money or money's worth.[33]

As we have decided that the September 16 agreed order created an indebtedness to Ms. Kahanic in the full amount of the policy proceeds and that the subsequent transfer of the policy proceeds is deemed to satisfy the consideration requirement of section 2053(c)(1)(A), it follows that, pursuant to our holding in Estate of Robinson v. Commissioner, 63 T.C. 717 (1975), the estate is entitled to deduct the full amount of the policy proceeds under section 2053(a)(4).

IV.  Whether the Estate Is Entitled To Deduct Accrued Interest on the $700,000 Loan From Ms. Kahanic

Generally, section 2053(a)(2) authorizes an estate to deduct administration expenses that are allowable by the law of the jurisdiction in which the estate is being administered.  Subject to limitations, an estate may borrow money to satisfy its Federal estate tax liability and deduct the interest incurred on the debt as an

---

[33] We note that the purpose of the "adequate and full consideration" requirement is to prevent the depletion of the estate by the use of agreements which would ultimately serve to avoid the estate tax.  Bank of New York v. United States, 526 F.2d 1012, 1016 (3d Cir. 1975); see Estate of Hartshorne v. Commissioner, 402 F.2d 592, 594 n.2 (2d Cir. 1968); Latty v. Commissioner, 62 F.2d 952, 953-954 (6th Cir. 1933).  There is no evidence that decedent and Ms. Kahanic intended to use the September 16 agreed order as a way to minimize the estate's Federal tax liability.

administration expense under section 2053(a)(2).  Estate of Bahr v. Commissioner, 68 T.C. 74 (1977); Estate of Todd v. Commissioner, 57 T.C. 288 (1971).

Illinois law provides that "all expenses incurred in connection with the settlement of a decedent's estate, including debts, * * * estate taxes, * * * [and] fees of attorneys and representatives * * * shall be charged against the principal of the estate."  760 Ill. Comp. Stat. Ann. 15/6(a) (West 2007).  Illinois law further provides that, as long as the executor is acting within the best interests of the estate and consistent with the decedent's will, he or she has the power to borrow money. 755 Ill. Comp. Stat. Ann. 5/28-8(b) (West 2011).  Decedent's will specifically grants to the executor of his estate the power "to borrow money for any purpose, at interest rates then prevailing, from any individual".

Respondent argues that the estate is not entitled to deduct the accrued interest on the $700,000 loan from Ms. Kahanic because the loan was not a bona fide debt and the loan was not actually and reasonably necessary to the administration of the estate.  Respondent also argues that the estate is not entitled to deduct the accrued interest because the estate has not proved that the interest will be paid.  We consider each of these arguments in turn.

A.  <u>Whether the Loan Was a Bona Fide Debt</u>

Whether a particular transaction is to be properly characterized as a loan depends on the facts and circumstances.  <u>Busch v. Commissioner</u>, 728 F.2d 945 (7th Cir. 1984), <u>aff'g</u> T.C. Memo. 1983-98.  Respondent's argument that the loan made by Ms. Kahanic to the estate is not a bona fide debt is based upon his analysis of six factors taken from <u>Estate of Graegin v. Commissioner</u>, T.C. Memo. 1988-477.  We recently discussed the significance of the factors mentioned in <u>Estate of Graegin</u> and what the Court looks for in deciding whether a bona fide debt has been created:

> While the factors taken from <u>Estate of Graegin</u> may provide helpful guidance, they are not exclusive, and no single factor is determinative.  See <u>Patrick v. Commissioner</u>, T.C. Memo. 1998-30, affd. without published opinion 181 F.3d 103 (6th Cir. 1999).  The factors are simply objective criteria helpful to the Court in analyzing all relevant facts and circumstances.  <u>Id.</u>  The ultimate questions are whether there was a genuine intention to create a debt with a reasonable expectation of repayment and whether that intention fits the economic reality of creating a debtor-creditor relationship.  <u>Litton Bus. Sys., Inc., v. Commissioner</u>, 61 T.C. 367, 377 (1973).

<u>Estate of Duncan v. Commissioner</u>, T.C. Memo. 2011-255.

Respondent contends that there is no indication that Ms. Kahanic intended to create a genuine debt and that the estate intended to repay the loan.  With respect to the former, respondent argues that Ms. Kahanic had no intention of

collecting the $700,000 that she lent the estate. As support respondent points out that Ms. Kahanic has not demanded repayment of the loan despite the fact that the note became due in May 2009. Respondent also argues that Ms. Kahanic benefited from the estate's timely payment of its Federal estate tax liability. Respondent reasons that if the estate was unable to pay in full its Federal estate taxes the IRS could have collected a portion of the estate's tax liability from Ms. Kahanic. See secs. 6324(a)(2), 6901(a). The estate counters that respondent fails to consider the facts known by the estate and Ms. Kahanic when the loan was made in May 2006.

Before receiving the loan in May 2006, the estate believed that it had assets valued at $1,274,545, $406,430 of which were in liquid form, to pay liabilities of $1,125,047.[34] When the estate received the loan and used the proceeds to pay its estate tax liabilities, it believed that it had total assets of $1,004,545 to pay off total liabilities (including the loan principal), of $855,047. This left the estate with nearly $150,000 to pay interest on the loan as well as any other liabilities.

The estate admits that Ms. Kahanic benefited from the estate's timely paying of its estate tax liabilities. It argues, however, that Ms. Kahanic's

---

[34] See supra note 14.

benefiting from the estate's payment and her intention to collect the loan are not exclusive of each other. We agree.

Ms. Kahanic credibly testified that Mr. Levine and the other accountants in his group assured her that she would be paid back and that the estate had sufficient assets to repay the loan. We believe the facts as of May 2006 support Mr. Levine's assurances to Ms. Kahanic. Additionally, Jeffrey Smith, an accountant with Levine Hahn who advises clients with respect to lending money, credibly testified that as of May 2006 the estate had sufficient assets to secure the $700,000 loan.

Respondent argues that if Ms. Kahanic intended to recover the loan she would have demanded repayment when the loan became due in May 2009. While we believe that Ms. Kahanic's demanding repayment in 2009 may have been an indication that she intended to collect the loan, we do not think the absence of such a demand shows that when she made the loan in May 2006 she did not intend to create a genuine debt. Ms. Kahanic did not demand repayment because doing so would have exhausted the estate's funds, thereby preventing the estate from challenging the IRS' deficiency determinations and potentially subjecting her to transferee liability. When the loan was made Ms. Kahanic intended to be repaid in full and was advised by Levine Hahn that the estate had sufficient assets to repay

the principal of the loan and any accrued interest. Thus, we believe that Ms. Kahanic intended to create a genuine debt when she lent the estate $700,000.

Respondent also argues that the estate never intended to repay the loan. He contends that when the estate agreed to the terms of the loan it knew that it would be unable to repay the loan. We disagree.

The estate believed that it had total assets of $1,004,545 to repay the loan plus any interest, $155,047 of the estate's other liabilities, and any additional legal fees and/or damages resulting from the defense of potential medical malpractice claims. Had the assets retained their estimated values and there was no deficiency proceeding brought against the estate, the estate would have been able to repay the loan along with any interest. We find that neither Mr. Fiala nor Levine Hahn had any knowledge that the estate's assets' values would dissipate in such a way as to make repayment of the loan difficult.

Additionally, Mr. Fiala credibly testified that when the loan was made he, as executor, intended to repay Ms. Kahanic. When asked why he had not made any payments on the loan, he stated that "[t]he position of the estate has deteriorated significantly since May 5 when [the note] was executed." Mr. Fiala also explained that John Argo, decedent's former business adviser, assured Mr. Fiala that the estate would be able to sell decedent's medical practice as a going concern.

Ultimately, however, "[t]he estate simply was forced to liquidate what was left of the practice for literally pennies, for the value of the equipment and furniture within the office." Finally, unexpected legal fees incurred as a result of this deficiency proceeding reduced the estate's assets even further. We find that the estate intended to repay the note and has not done so only because of unforeseen circumstances that have reduced the values of the estate's assets.

Taking into consideration all of the facts and evidence, specifically the testimony of the relevant parties to the loan and the estate's financial picture as of May 5, 2006, we believe that a bona fide debt was created between Ms. Kahanic and the estate.

B. Whether The Loan Was Actually And Reasonably Necessary

The amount of deductible administration expenses is limited to those expenses which are actually and necessarily incurred in the administration of the estate. Estate of Todd v. Commissioner, 57 T.C. at 296; sec. 20.2053-3(a), Estate Tax Regs. Respondent argues that the loan was not actually and reasonably necessary because the estate (1) had the right to recover from Ms. Kahanic a portion of the estate's tax liabilities and (2) could have collected and sold nonliquid assets in time to pay its estate tax liabilities.

## 1. Right to Contribution From Ms. Kahanic

Unless the decedent directs otherwise in his will, section 2206 allows for the executor to recover from a beneficiary of life insurance proceeds on the decedent's life the portion of tax paid by the estate as the proceeds of the policy bear to the taxable estate.[35] Decedent's will expressly provides that the estate tax liabilities are to be paid first out of his residuary estate and, if insufficient, out of the Declaration of Trust. Decedent's will also waives "any right of reimbursement for, recovery of, or contribution toward the payment of * * * taxes."

Respondent argues that the estate had a right to request contribution from Ms. Kahanic, notwithstanding decedent's will, because the residuary estate and the Declaration of Trust did not contain sufficient assets to pay the estate's tax liabilities.[36] We disagree. The estate had sufficient assets to pay its estate tax

---

[35] Sec. 2206 provides in pertinent part:

   Unless the decedent directs otherwise in his will, if any part of the gross estate on which tax has been paid consists of proceeds of policies of insurance on the life of the decedent receivable by a beneficiary other than the executor, the executor shall be entitled to recover from such beneficiary such portion of the total tax paid as the proceeds of such policies bear to the taxable estate.

[36] Respondent contends that in In re Estate of Williams, 853 N.E.2d 79 (Ill. App. Ct. 2006), the Appellate Court of Illinois held that in such a scenario the excess tax liabilities are to be apportioned between the beneficiaries of the

(continued...)

liabilities when it received the loan proceeds; the assets simply were in illiquid form.[37]  Respondent concedes that the estate could not seek contribution from Ms. Kahanic if decedent's residuary estate and/or Declaration of Trust had sufficient assets to pay the estate's tax liabilities.  Thus, the estate had no right seek contribution from Ms. Kahanic when it made the decision to borrow $700,000.

> 2.  Whether the Estate's Assets Could Have Been Liquidated in Time To Pay its Estate Tax Liabilities

Respondent next argues that the estate could have liquidated its assets before its taxes were due, thereby making the loan unnecessary.[38]  Specifically, respondent argues that the estate could have recovered more than $400,000 by liquidating AEPS and collecting decedent's unpaid compensation.

---

[36](...continued)
decedent's probate and nonprobate assets.  In In re Estate of Williams the decedent's will directed that her estate tax liability was to be paid out of her residuary estate "without apportionment or reimbursement", but her will did not mention who would be responsible for the tax liability if the residuary estate lacked the assets necessary to pay the liability.  Id. at 81.  The Appellate Court decided that the tax liability should be apportioned among those who received probate and nonprobate assets.  Id. at 84.

[37]  See supra note 14.

[38]  We note that this argument is inconsistent with respondent's position that the estate could have sought contribution from Ms. Kahanic because it did not have sufficient assets to pay its estate tax liabilities.  See supra pp. 46-47.

Expenses incurred to prevent financial loss to an estate resulting from a forced sale of its assets in order to pay estate taxes are deductible administrative expenses. See Estate of Todd v. Commissioner, 57 T.C. 288; Estate of Graegin v. Commissioner, T.C. Memo. 1988-477. Instead of liquidating AEPS and selling its assets one by one, Mr. Fiala acted on the advice of Mr. Argo and attempted to maximize AEPS' value by selling it as a going concern. By the time the taxes became due, the estate had not sold AEPS and needed to borrow money. Additionally, liquidating AEPS and selling its individual assets in a forced sale would have resulted in financial loss. Of AEPS' $580,824 of total assets, $443,396 were in the form of accounts receivable. If the estate chose to sell the accounts receivable it likely would have been at a deep discount to reflect the present values of the receivables and possibility of uncollectibility.

With respect to decedent's unpaid compensation, AEPS lacked the cash necessary to pay the estate. AEPS had only $117,364 in a Harris Bank checking account when decedent died and still owed expenses related to the winding up of AEPS and $115,000 on a line of credit with Harris Bank. Also, Mr. Fiala had to consider the possibility of two medical malpractice lawsuits and a lawsuit brought by decedent's former employees. We do not find it unreasonable that the estate

had yet to collect decedent's unpaid compensation, especially considering the large amounts of uncollected accounts receivable.

On the facts of this case, we are satisfied that the interest on the loan was "actually and necessarily incurred", as required by section 20.2053-3(a), Estate Tax Regs.

### 3.  Whether the Accrued Interest Will Be Paid

The remaining issue is whether the estate will pay the accrued interest.  See sec. 20.2053-1(b)(3), Estate Tax Regs.  Respondent contends that the estate has not shown that the accrued interest will be paid, and therefore the estate is not entitled to deduct the interest.  The estate counters that if it prevails as to the deductibility of the Reliastar policy proceeds it will have the funds necessary to repay the interest.

As of July 31, 2010, the estate's liabilities ($778,484) exceeded its assets ($603,893) by roughly $175,000.[39]  However, when we remove the loan's principal amount (which will not be paid off until after the accrued interest is satisfied)[40] from the estate's liabilities, the estate's assets exceed its liabilities by

---

[39]  See supra note 22.

[40]  See supra p. 17.

more than $440,000.[41]  Thus, the estate has the funds necessary to repay the accrued interest, and we believe that the estate has credibly stated that it will do so.[42]

The estate has shown that:  (1) a bona fide debt was created; (2) the loan and accrued interest were actually and reasonably necessary to the administration of the estate; and (3) the accrued interest will be paid.  Accordingly, the estate is entitled to deduct the accrued interest under section 2053(a)(2).

## V.  Deduction For Additional Accountant's and Attorney's Fees

The estate contends that it is entitled to deduct additional reasonable attorney's fees, accountant's fees, and other administrative expenses under Rule 155.  The parties stipulated that "[t]o the extent that they are reasonably incurred in the administration of [d]ecedent's estate, and have been or will be paid, such additional fees and expenses will be taken into account in the computations to be made pursuant to U.S. Tax Court Rule 155."  There is nothing in the record to suggest that the foregoing expenses were not reasonably incurred in the

---

[41]  As of July 31, 2010, the estate's assets totaled $603,893, and the estate's liabilities, excluding the loan's principal amount, totaled $162,484.

[42]  We do not find, as respondent contends, that the estate's failure to make any payments on the loan as of the date of trial indicates that the estate will not now repay the interest.  As discussed supra pp. 44-45, the estate failed to repay the loan on account of the unexpected reductions in the values of its assets and the uncertainty stemming from the proceedings before the Court.

administration of decedent's estate or will not be paid, and the parties may take them into consideration in the Rule 155 computations.

In reaching our holdings, we have considered all arguments made, and to the extent not mentioned, we consider them irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.